UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ANDREW S. MEYER,

        Plaintiff,

                                           Case Number 07-13867-BC
v.                                       Honorable Thomas L. Ludington

MARC WOODWARD, WARD CARTER,
and ERIC WISSNER,

        Defendants.

_____ /

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS WOODWARD AND CARTER'S MOTION FOR SUMMARY JUDGMENT

On September 13, 2007, Plaintiff Andrew Meyer filed a complaint [Dkt. # 1] against Defendants Marc Woodward, Ward Carter, Eric Wissner, Philip Lafata, Christine Werth, Scheurer Hospital, and Scheurer Healthcare Network. On March 20, 2008, all of the parties stipulated to the dismissal of Defendant Christine Werth [Dkt. # 23], with prejudice, and on April 21, 2008, the parties stipulated to the dismissal of Defendants Philip Lafata, Scheurer Hospital, and Scheurer Healthcare Network [Dkt. # 26], with prejudice. On April 21 and 22, 2008, pursuant to the parties' stipulations, the Court ordered the dismissal of Defendants Philip Lafata, Christine Werth, Scheurer Hospital, and Scheurer Healthcare Network [Dkt. # 27, 28], with prejudice.

In his complaint, Plaintiff alleges federal constitutional claims under 42 U.S.C. § 1983 and state law claims against Defendants Wissner, Woodward, and Carter. First, Plaintiff asserts Fourth and Fourteenth Amendment claims against Defendants Wissner and Woodward, alleging that Defendants Wissner and Woodward illegally seized him and deprived him of liberty by restraining him in order to allow a doctor to perform a catheterization procedure to which Plaintiff allegedly did not consent. Second, Plaintiff asserts Fourth Amendment claims against Defendants Woodward

and Carter, alleging that they arrested him without probable cause. Third, Plaintiff alleges state law claims of assault and battery, false arrest, false imprisonment, gross negligence, and civil conspiracy based on the circumstances surrounding his arrest and performance of the catheterization procedure.

On July 7, 2008, Defendant Wissner filed a motion for summary judgment [Dkt. # 29], and on July 14, 2008, Defendants Woodward and Carter filed a motion for summary judgment [Dkt. # 33]. On August 4, 2008, Plaintiff filed responses [Dkt. # 38, 39] to both motions. On August 13, 2008, Defendant Wissner filed a reply [Dkt. # 40]; Defendants Woodward and Carter did not file a reply. The Court scheduled both motions for hearing on September 22, 2008. At the hearing, counsel for Plaintiff stated on the record that the claims against Defendant Wissner had been resolved; counsel for Defendant Wissner did not attend the hearing. Accordingly, the Court only heard oral argument on Defendants Woodward and Carter's motion for summary judgment.

I

On September 22, 2005, Plaintiff and a companion were involved in an automobile accident on a narrow dirt road a few miles outside of Caseville, Michigan. According to Plaintiff, he was a passenger in the car when his companion crashed into a tree. Subsequently, the pair tried unsuccessfully to push the car off the tree. Plaintiff left the scene on foot, allegedly to get help, when he was picked up by a cousin and given a ride to his Grandmother Cilc's house. According to Plaintiff, he informed his grandmother of the accident and asked her to call 911, then his grandfather gave him a ride to his Grandmother Meyer's house. Plaintiff's Grandmother Meyer notified the police that Plaintiff was at her house.

When the Huron County Sheriff's Department learned of the accident involving Plaintiff and his companion, the Department dispatched two deputies, Defendants Woodward and Carter, in

separate cars, to the scene of the accident. Defendant Carter was the officer in charge, and Defendant Woodward was the assisting officer. At the scene, the deputies observed Plaintiff's companion sitting on the passenger seat of a two door car, being attended to by the EMS. She told the officers that she had lost control of the vehicle, and drove into a tree. She denied that anyone else had been in the car with her. EMS took her to Scheurer Hospital for treatment.

Subsequently, Defendants Woodward and Carter looked into the car and found a pair of eyeglasses lying on the floor between the driver's seat and the door. A local resident approached the deputies and told them that he had seen two people, a man and a woman, at the car just after the crash. The witness reported that the man left the scene before the EMS and police arrived.

When Defendants Woodward and Carter arrived at Plaintiff's grandmother's house,[1] they were invited in. Plaintiff admitted to Defendants that he had been in the car, but Plaintiff denied that he had been the driver. According to Defendants, Plaintiff was intoxicated. Plaintiff claimed he left the scene to get help because neither he nor his companion had cell phones.[2] According to Plaintiff, he told Defendants that he was not injured.

According to Plaintiff's version of events, Defendant Carter grabbed him by the arm and pulled him out of the house. Then Defendant Carter told Plaintiff that he was placing him under arrest, told Plaintiff to put his hands behind his back, handcuffed Plaintiff, put Plaintiff in the back of one of the patrol cars, and shut the car door. After a minute or so, and after conversing with Defendant Woodward, Defendant Carter opened the car door and asked Plaintiff to lift his shirt.

---

[1] According to Defendants Woodward and Carter's motion for summary judgment, the deputies learned Plaintiff was involved in the accident and at his grandmother's house after conducting an investigation. However, the motion does not allege any particulars of the investigation.

[2] According to Defendants Woodward and Carter, they had been told that Plaintiff's companion called in the accident from a cell phone at the scene.

-3-

After Plaintiff pointed out that he could not lift his shirt because his hands were cuffed, Defendant Carter ordered Plaintiff to get out of the car and lifted Plaintiff's shirt. According to Plaintiff, a photograph taken later at the hospital demonstrates that the most visible marks are on the top right of Plaintiff's chest, in an area that would be contacted by a passenger's seatbelt.[3]

Defendants Woodward and Carter returned Plaintiff to the back of the patrol car and drove away without telling Plaintiff where they were going. Plaintiff assumed that Defendants were taking him to jail, but after some time had passed, Plaintiff recognized that they were not headed in the direction of the jail. Plaintiff asked where they were going and Defendant Woodward told him that they were going to the hospital to which EMS took his companion.[4] Defendants Woodward and Carter assert that Plaintiff was transported to the hospital for a blood draw to be performed.

At some point, Defendants Woodward and Carter contacted the Chief Deputy of the Village of Pigeon Police Department, Eric Wissner, for the purpose of staying with Plaintiff's companion until they could arrive at the hospital. When Defendant Carter arrived at the hospital, he went to

---

[3] The photograph is attached to Defendant's motion for summary judgment as Exhibit E. Plaintiff's representation appears to be correct, but the image is not extremely clear.

[4] According to Defendant Carter's version of events, it was difficult to interview Plaintiff inside the house, because his grandmother was becoming upset and his two juvenile stepsisters were present. Defendant Carter also expressed concern that Plaintiff would flee, because he had already left the scene of the accident. Defendant Carter handcuffed Plaintiff in the home and walked him several feet to the driveway, where a police car was parked. He did not tell Plaintiff he was under arrest, nor did he intend to arrest Plaintiff. Either Defendant Woodward or Carter asked Plaintiff if he had been wearing a seatbelt during the crash, and Plaintiff indicated that he had been. Upon the request of Defendant Carter, Plaintiff raised his shirt, such that the deputies observed a seat belt mark on Plaintiff's torso that ran diagonally across his sternum from his left shoulder to his right hip.
  According to Defendants, they informed Plaintiff that they were going to the hospital to confront his companion and Plaintiff agreed to go along. Plaintiff rode to the hospital in the back of Defendant Woodward's car. During the drive, Plaintiff asked Defendants if they had found any eyeglasses in the car, because he had lost his during the crash. As Defendant Woodward's car approached the hospital, about five miles from Plaintiff's grandmother's house, Plaintiff complained about left shoulder pain and Defendant Woodward told him that he could seek medical attention at the hospital.

speak with Plaintiff's companion.  For awhile she continued to deny that Plaintiff had been in her car, but eventually, she admitted that fact.  She denied that Plaintiff was the driver, but also told Defendant Carter that her insurer would not pay for any loss if someone else had been driving her car. When Defendant Carter asker her to show him any seatbelt marks, she instinctively showed him her right shoulder.

According to Plaintiff, when he arrived at the hospital, his hands were uncuffed from behind his back and re-cuffed in front of him.  Plaintiff testified that he was asked if he wanted anything checked out and that he replied that he might as well since he was at the hospital.  Plaintiff testified that he signed in for treatment while his hands were still cuffed and told the hospital personnel that his right wrist and arm were sore.  Plaintiff completed a medical consent form, which stated, "I consent to the procedures and treatments performed by physicians, hospital staff, and all other healthcare providers caring for me."  Plaintiff was taken to a room to be examined.

Plaintiff was initially assessed by Nurse Christine Werth.  She testified that when she first observed Plaintiff, his arms were handcuffed to the hospital bed rails.  She also testified that Plaintiff was agitated and swearing, but that she was able to perform an assessment.  According to Nurse Werth, Plaintiff was appropriate in answering questions and she believed he was capable of making informed decisions about his care and treatment.  Nurse Werth testified that she did not feel physically threatened by Plaintiff.

Next, the emergency room physician, Dr. Philip Lafata, examined Plaintiff.  Dr. Lafata testified that Plaintiff cooperated in providing his medical history, answering questions, and generally allowing himself to be examined.  After examining Plaintiff, Dr. Lafata requested that Nurse Schaefer obtain blood work and a urine sample from Plaintiff.  Defendant Carter had

requested a blood draw, and Plaintiff consented to having his blood drawn. Plaintiff was generally cooperative during the procedure.

Dr. Lafata determined that a urinalysis was needed to ensure that Plaintiff had not sustained any renal or bladder injuries, which he testified are common in motor vehicle accidents. It is undisputed that the urinalysis was ordered by Dr. Lafata for medical purposes, not as part of a criminal investigation. Plaintiff initially consented to provide the urine sample and Nurse Schaefer placed his penis in a urinal, a procedure that Plaintiff did not resist. When Plaintiff was unable to voluntarily provide a urine sample, Nurse Schaefer informed Dr. Lafata, who then ordered that Plaintiff be catheterized. Dr. Lafata admits that he ordered the catheterization as a medical necessity for a patient involved in an automobile accident. Nurse Schaefer also testified that she found Dr. Lafata's order to be reasonable. Defendants Woodward and Carter and Chief Deputy Wissner were not involved in the catheterization order.

Plaintiff struggled during the catheterization and admitted to kicking Nurse Schaefer when she attempted to insert the catheter. Plaintiff maintains that he verbally objected to the catheterization. Dr. Lafata testified that he was unaware of any verbal objection, and testified that because Plaintiff was belligerent throughout the examination, Plaintiff's physical resistance did not cause him to believe that Plaintiff had revoked the consent he had given earlier. Defendant Woodward, Chief Deputy Wissner, and Nurse Schaefer also testified that they did not hear any verbal objection by Plaintiff.

The doctor ordered Defendant Woodward and Chief Deputy Wissner to restrain Plaintiff for the safety of everyone in the room and so that the catheterization could be completed. According to Plaintiff:

[After kicking the nurse], I was just laying there on my back and I started getting irate. And then, I'm not sure if it was one or two cops, had grabbed my arms, and [Chief Deputy] Wissner was on my right leg, he grabbed my right leg and pushed it down and he handcuffed me. And I believe it was [Defendant] Carter was on my left leg, and he was holding my leg down and he cuffed that leg to the bed, while [Chief Deputy] Wissner cuffed my right leg to the bed. And [Defendant] Woodward was up here and got my left arm, I'm not sure if it was the doctor or somebody got my right arm.

At some point, Plaintiff bit Defendant Woodward. While the time of arrest is disputed, it is undisputed that Plaintiff was arrested before the catheterization took place.

II

Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). A fact is "material" if its resolution affects the outcome of the case. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

The party bringing the summary judgment motion has the initial burden of informing the

court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. The party who bears the burden of proof must present a jury question as to each element of the claim, *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000), rather than raise only "metaphysical doubt as to the material facts." *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

### III

Plaintiff asserts two claims under 42 U.S.C. § 1983. First, Plaintiff asserts Fourth and Fourteenth Amendment claims against Defendant Woodward, alleging that Defendant Woodward illegally seized him and deprived him of liberty by restraining him in order to allow a doctor to perform a catheterization procedure to which he did not consent. Second, Plaintiff asserts Fourth Amendment claims against Defendants Woodward and Carter, alleging that they arrested him without probable cause.

A

Plaintiff argues that Defendant Woodward violated his constitutional rights by helping to physically restrain Plaintiff so that medical personnel could perform a catheterization procedure.[5] Defendant Woodward argues that he did not violate Plaintiff's constitutional rights because Plaintiff was in policy custody, Defendant Woodward had an obligation to ensure that Plaintiff received medically necessary treatment, and Defendant Woodward was only following Dr. Lafata's order. Defendant Woodward further argues that even if he violated Plaintiff's constitutional rights, he is entitled to qualified immunity because such a right was not clearly established. In turn, Plaintiff argues that it was clearly established that Plaintiff had constitutional rights to refuse medical treatment, and to be protected from assault while in police custody.

To show a violation of § 1983, a plaintiff must show that a defendant acted under color of state law, and that the offending conduct deprived him of rights secured by federal law. *Mezibov v. Allen*, 411 F.3d 712, 717 (6th Cir. 2005) (citation omitted). Neither the U.S. Supreme Court nor the Sixth Circuit have addressed the constitutionality of a police officer acting to restrain a detainee so that medical personnel can perform a catheterization that a doctor has deemed medically necessary. Defendant Woodward urges this Court to adopt the Seventh Circuit's reasoning in *Sullivan v. Borneman*, 384 F.3d 372, 373 (7th Cir. 2004). In *Sullivan*, the court found that there is "no rule to the effect that law enforcement officials are constitutionally prohibited from briefly restraining a detainee at the direction of qualified medical personnel, with the purpose of minimizing injury to the detainee." *Id.* at 377. The court reasoned that "the defendant officers did not violate

_____

[5] Defendants Woodward and Carter, and Chief Deputy Wissner assert that Defendant Carter was not in the room when the catheterization occurred. Plaintiff previously stated that Defendant Carter helped the others to restrain him, however, Plaintiff does not appear to pursue that claim in his summary judgment responses.

any of [the plaintiff's] clearly established rights by restraining him because a rule contrary would force police officers to second-guess the medical judgment of emergency room physicians." *Id.* at 375.

In *Sullivan*, the plaintiff was arrested for disorderly conduct, and the state jail would not admit him before it received a medical clearance. *Id.* at 373. Two police officers transported the plaintiff to a local hospital in order to obtain a medical clearance. *Id.* The doctor at the hospital determined that a urine sample was medically necessary, and ordered a catheterization when the plaintiff failed to voluntarily produce a sample. *Id.* The police officers did not play any role in that decision, and informed the plaintiff that the urine sample would not be used for criminal prosecution. *Id.* at 374. The plaintiff did not consent to the catheterization, and at the doctor's request, the police officers restrained the plaintiff during the procedure. *Id.* at 373-74. The Seventh Circuit affirmed the district court's grant of summary judgment to the defendant police officers because the facts did not show that "the officers' conduct violated [the plaintiff's constitutional rights]." *Id.* at 376.

First, the court recognized that the Fourth Amendment did not absolutely protect the plaintiff's expectations of privacy; protection applies only to "legitimate expectations that in certain places and at certain times an individual has the right to be let alone." *Id.* at 377 (quoting *Winston v. Lee*, 470 U.S. 753, 758 (1985)). Subsequent to his arrest, the plaintiff had a diminished expectation of privacy. *Sullivan*, 384 F.3d at 377. In addition, the state had a legitimate interest in "taking [the plaintiff] to the emergency room for a medical clearance after he registered a high score on a breathalyzer test." *Id.* at 376. Accordingly, the court found that the police officers actions did not violate the plaintiff's Fourth Amendment rights because the officers were "entitled to seek medical attention." *Id.* at 377.

Second, with respect to due process under the Fourteenth Amendment, the court held that whether the plaintiff's constitutional rights have been violated "must be determined by balancing his liberty interests against the relevant state interests." *Id.* at 378 (quoting *Cruzan v. Missouri Dept. of Health*, 497 U.S. 261, 279 (1990)). The court had "little trouble finding that the minimal invasion of [the plaintiff's] privacy interest here is outweighed by the state's [substantial] interest" in "assuring the medical stability of its pretrial detainees." *Sullivan*, 384 F.3d at 378. *See also id.* at 376 (noting that the court had previously explained in *Estate of Allen v. City of Rockford*, 349 F.3d 1015, 1020 (7th Cir. 2003), that police officers "would have left themselves open to charges of due process violations for failure to provide appropriate medical care to a pretrial detainee" if they had prevented necessary medical treatment).

Plaintiff attempts to distinguish *Sullivan* on the grounds that the state's interest in assuring the medical stability of its pretrial detainees does not exist under the circumstances surrounding his catheterization. In *Sullivan*, the plaintiff was brought to the hospital for the purpose of obtaining a medical clearance so that he could be booked into jail. According to Plaintiff, Defendants Woodward and Carter only brought Plaintiff to the hospital to have him available when they interviewed his companion and to complete their investigation, not for medical treatment. However, even if this difference in factual circumstances is accurate, it does not negate the state's interest. It is undisputed that before the catheterization occurred, Plaintiff had been detained and arrested. Once Dr. Lafata determined that a urine sample was medically necessary to ensure that Plaintiff did not have internal injuries, the state was obligated to ensure Plaintiff's medical well-being. By restraining Plaintiff at the doctor's request, Defendant Woodward was ensuring that Plaintiff received the medical treatment that he needed, not preventing him from receiving it.

Defendant Woodward also urges the Court to follow *Rudy v. Village of Sparta*, 990 F.Supp. 924 (W.D. Mich. 1996), *aff'd*, 1997 U.S. App. LEXIS 33050 (6th Cir. 1997). In *Rudy*, a police officer took the plaintiff to a hospital with a warrant for a blood draw because the nurse at the sheriff's department refused to perform the blood draw without a medical clearance. *Id.* at 926. The doctor ordered a urine sample to be taken as a screen for possible drug use because he perceived that the plaintiff was combative. *Id.* at 927. The plaintiff failed to voluntarily provide a sample, and the doctor ordered a catheterization. *Id.* After the plaintiff indicated that he was not ready to produce a urine sample, the police officer grabbed the plaintiff's arm and told the doctor to "just do it." *Id.*

Although the court found that the police officer had "assisted" with the catheterization, it also found only a "mere scintilla of evidence that [defendant] ordered the catheterization" when he held the plaintiff down and instructed the doctor to "just do it." *Id.* at 928-29. Because the police officer's conduct did not "cause" any potential constitutional violation, the police officer could not be held liable under § 1983. The Sixth Circuit affirmed summary judgment for the police officer. *See also Lovett v. Boddy*, 810 F.Supp. 844, 848-49 (W.D. Ky. 1993) (upholding summary judgment in favor of a police officer and a hospital employee on § 1983 claims because they did not "cause" a catheterization when they did not order it or insert the catheter); *Bickham v. City of Grand Rapids*, No. 1:05-CV-18, 2006 WL 1627603, at **2-3 (W.D. Mich. June 12, 2006) (finding that an unwanted catheterization accomplished by the use of physical restraints did not form a basis for § 1983 liability because the medical personnel were private actors and the supervising physician made treatment decisions based on his own medical judgment, not the state's desire for evidence); *United States v. Walther*, 652 F.2d 788, 791 (9th Cir. 1981) (noting that "where the private party had a legitimate independent motivation for" engaging in the challenged conduct, the Fourth Amendment

does not apply); *United States v. Howard*, 752 F.2d 220, 227 (6th Cir. 1985) (finding that a private party is not an agent of the government when "the intent of the private party conducting the search is entirely independent of the government's intent to collect evidence for use in a criminal prosecution").

The circumstances in *Sullivan* and *Rudy* are remarkably similar to this case. It is undisputed that Dr. Lafata ordered the catheterization because he had determined that it was medically necessary. It is also undisputed that the catheterization was not ordered for an evidentiary purpose, or as part of a criminal investigation. Defendant Woodward did not order the catheterization or insert the catheter. Thus, there does not appear to be a compelling reason to distinguish this case from *Sullivan* or *Rudy*. Plaintiff does not cite any cases supporting a contrary view.

In his response to Defendant Woodward's motion for summary judgment, Plaintiff focuses on his due process rights under the Fourteenth Amendment. Plaintiff asserts that Defendant Woodward had a "duty to assume some responsibility for his safety and general well-being" while he was in police custody. *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 200 (1989). Plaintiff asserts that Defendant Woodward's actions were not consistent with this duty when he physically restrained Plaintiff in order to enable the doctor to catheterize Plaintiff against his will.

However, in *Walker v. Norris*, the Sixth Circuit held that "'[i]n the face of a constitutional commandment' expressly proscribing unreasonable seizures, we should not ask instead whether 'the challenged seizure could be found to have run afoul of' the Fourteenth Amendment's seemingly less applicable due process clause." 917 F.2d 1449, 1454 (6th Cir. 1990) (quoting *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir.1988)). In this case, Plaintiff's claims appear to fit within the scope of the Fourth Amendment's search and seizure analysis; thus, analysis under substantive due process

-13-

is inappropriate.[6]

Viewing the facts in the light most favorable to Plaintiff, he cannot establish that Defendant Woodward violated his constitutional rights. The only significant fact disputed regarding the catheterization is whether Plaintiff consented to the procedure. As indicated above, whether Plaintiff consented is immaterial to the analysis; Plaintiff was in police custody and Defendant Woodward had a duty to ensure that Plaintiff received the medical care that he needed. Thus, Defendant Woodward is entitled to summary judgment on this claim.

Even if Plaintiff can establish that Defendant Woodward violated his constitutional rights, Defendant Woodward is entitled to qualified immunity. "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The privilege serves the purpose of, early in litigation, preventing suits from progressing because qualified immunity is *immunity* from suit, not merely a defense to liability. *See id.* at 200-201.

Qualified immunity provides 'that government officials performing discretionary functions

---

[6] Plaintiff asserts that the actions of Defendant Woodward are subject to a deliberate indifference standard under a substantive due process analysis. *Walker v. Norris*, 917 F.2d 1449, 1454 (6th Cir. 1990). Plaintiff claims that Defendant Woodward's actions should be characterized as deliberately indifferent because he allowed Chief Deputy Wissner and the nurse to commit an assault and battery when "it was obvious that Plaintiff was not consenting to be catheterized." Plaintiff asserts that Defendant's actions were not justified by a desire to protect everyone in the room, because no one would have been at risk if the nurse had not attempted to catheterize Plaintiff. Taking into account the fact that Defendant Woodward knew that the doctor considered the procedure to be medically necessary to ensure Plaintiff's well-being, it cannot be said that Defendant Woodward acted with deliberate indifference.

Moreover, when a person is in state custody, the state assumes the responsibility to ensure that the detainee receives adequate medical care. *Deshaney*, 489 U.S. at 200. The state cannot "unduly restrain" a detainee in the course of treatment by the state. *Lanman v. Hinson*, 529 F.3d 673, 681 (6th Cir. 2008). Undue restraint occurs "when and to the extent professional judgment deems [bodily restraint] unnecessary to assure safety and treatment." *Id.* at 689. In this case, Plaintiff was not unduly restrained because the doctor requested assistance from Defendant Woodward. A finding of deliberate indifference in these circumstances, when the doctor deemed restraint was necessary, would contradict the deference that the state is required to give to medical professionals providing treatment.

generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Sixth Circuit undertakes a three step analysis to determine whether an official is entitled to immunity:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Id.* at 901. With regard to the second step, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted). Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2001) (citation omitted).

Plaintiff argues that Defendant Woodward is not entitled to qualified immunity because of two clearly established rights. First, Plaintiff argues that he has a clearly established right to refuse medical treatment. Even assuming Plaintiff did not consent to the catheterization, it is not clearly established that he had a right to refuse. As discussed above, the state has an interest in ensuring the medical stability of its detainees. It is undisputed that Plaintiff was detained at the time the procedure was performed. A doctor determined that a catheterization was a medically necessary

procedure. Thus, it is not clear that Plaintiff had a right to refuse the treatment. Even if he did have such a right, Defendant Woodward did not order or conduct the procedure.

Second, Plaintiff argues that he had a clearly established right to be protected, by Defendant Woodward, from assault by the others in the room. Assuming such a right, it would not be clear to a reasonable official in the same position as Defendant Woodward that his conduct was unlawful. Defendant Woodward was merely following orders from a doctor to assist the doctor in carrying out a treatment deemed medically necessary by that doctor. It would not have been clear to Defendant Woodward that Plaintiff was in need of protection from assault.

Plaintiff has not shown the existence of any law prior to the events leading to this lawsuit which would have put a reasonable officer on notice that the actions of physically restraining a detainee at the request of medical personnel for the sole purpose of providing medical treatment, violated the constitution. *See Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) ("In determining whether a constitutional right is clearly established, the court must first look to decisions of the U.S. Supreme Court, then to decisions of the Sixth Circuit, and, finally to decisions of other circuits."). In light of the fact that the U.S. Supreme Court has not addressed the issue, the Seventh Circuit's holding in *Sullivan*, and the Sixth Circuit's affirmation of *Rudy*, it cannot be said that Defendant Woodward's actions violated a clearly established constitutional right. Accordingly, Defendant Woodward is entitled to qualified immunity with respect to Plaintiff's claims under § 1983 that arise out of the circumstances surrounding the catheterization procedure.

B

Plaintiff also argues that Defendants Woodward and Carter violated his Fourth Amendment rights by arresting him without probable cause. Defendants contend that Plaintiff's detention and

-16-

arrest were constitutional. Defendants further argue that even if they violated Plaintiff's constitutional rights, they are entitled to qualified immunity because it cannot be said that either one knew, or that a reasonable police officer in the same position should have known, that his actions violated a clearly established constitutional right.

The parties heavily dispute the facts surrounding Plaintiff's arrest, and neither party provides overwhelming evidence supporting their version of the facts. The most significant dispute concerns the time of arrest. Plaintiff asserts that he was arrested inside his Grandmother Meyer's house, and alleges that Defendant Carter handcuffed him inside the house and told him that he was under arrest at that time. In contrast, Defendant Carter alleges that he did not handcuff Plaintiff until they were all outside Plaintiff's grandmother's house, and that he never told Plaintiff that he was under arrest. Defendants have not articulated a theory as to when Plaintiff was actually arrested, beyond stating that Plaintiff was arrested sometime before the catheterization took place.

Because the issue is before the Court on Defendants' motion for summary judgment, the Court will view the facts surrounding Plaintiff's arrest in the light most favorable to Plaintiff. Assuming it is true that Defendant Carter handcuffed Plaintiff and told him he was under arrest, at that point, Plaintiff was arrested as a matter of law. Thus, the question raised is whether Defendant Carter had probable cause to arrest Plaintiff at that time.

"Probable cause" requires officers to determine "whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [subject] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (citations omitted). Probable cause requires "more than bare suspicion." *Brinegar v. United States*, 338 U.S. 160, 175 (1949).

Generally, "the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995) (citation omitted).

When Defendant Carter allegedly arrested Plaintiff, he knew the following undisputed facts: Plaintiff had been involved in a car accident, at least as a passenger. Plaintiff left the scene of lthe accident before the EMS or police arrived. Plaintiff told Defendants that he left to get help because neither he nor his companion had a cell phone. Plaintiff's companion had called 9-1-1 from a cell phone at the scene of the accident. Plaintiff was intoxicated. Plaintiff's companion had lied to Defendants when she told them that no one else had been in the car with her at the time that the accident occurred.[7] When Defendants arrived at the scene of the accident, Plaintiff's companion was sitting on the passenger's side of the car. According to Plaintiff, Defendants also knew that Plaintiff had asked his Grandmother Cilc to call 9-1-1.[8]

Undisputably, these facts raise a suspicion that Plaintiff was the driver of the car, rather than a passenger. They are logically consistent with a conclusion that Plaintiff was the driver, and that he left the scene to avoid liability for driving while intoxicated. However, a determination that Defendant Carter had probable cause to arrest Plaintiff is clearly not the "only reasonable determination possible." Thus, Defendants Woodward and Carter are not entitled to summary judgment on this claim.

Defendants Woodward and Carter also assert that they are entitled to qualified immunity because any constitutional violation was not of a "clearly established right." However, it is "clearly

---

[7] Plaintiff does not allege that his companion did not lie. Instead, he asserts that there is "no confirmation" that his companion lied and that her deposition has not been taken.

[8] The dispatch call log indicates that she did call 9-1-1.

established," *Tucker*, 388 F.3d at 220, that probable cause is necessary for an arrest under the Fourth Amendment. Viewing the facts in the light most favorable to Plaintiff, "a reasonable [officer] would have understood that his behavior violated that right." *Id.* Finally, Plaintiff has alleged sufficient facts, and provided sufficient evidence to indicate that what the officer did was "objectively unreasonable in light of the clearly established rights." *Id.*

IV

Plaintiff alleges several state law claims based on the circumstances surrounding his arrest and performance of the catheterization procedure. Plaintiff's state law claims include assault and battery, false arrest, false imprisonment, gross negligence, and civil conspiracy. Defendants assert two bases for summary judgment on these claims. First, Defendants assert that they are entitled to governmental immunity, as their actions were not grossly negligent. Second, Defendants assert that Plaintiff's claims fail on their merits.

A

A government officer is immune from tort liability when the following requirements are met: (1) the officer "is acting or reasonably believes he or she is acting within the scope of his or her authority," (2) "[t]he governmental agency is engaged in the exercise or discharge of a governmental function, and (3) the officer's "conduct does not amount to gross negligence that is the proximate cause of the injury or damage." Mich. Comp. Laws § 691.1407(2). "Gross negligence" means "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(7).

With respect to the circumstances surrounding the catheterization procedure, Plaintiff does not dispute that Defendant Woodward was acting within the scope of his authority. Rather, Plaintiff

asserts, without explanation, that Defendant Woodward's actions were grossly negligent. Presumably, Plaintiff would argue that Defendant Woodward's actions were grossly negligent because Defendant Woodward should have realized that Plaintiff did not consent to the catheterization procedure due to his physical resistance and alleged verbal objection. Considering Plaintiff kicked Nurse Schaefer when she attempted to catheterize him, and his physical resistance generally, a trier of fact could reasonably conclude that Plaintiff did not consent to the procedure. Plaintiff would then argue that actions that Defendant Woodward took to restrain Plaintiff when he knew that Plaintiff did not consent to the medical procedure demonstrated "a substantial lack of concern" for whether Plaintiff would be injured.

In contrast, Defendant Woodward asserts that his actions were designed solely to ensure that no individuals were injured during the catheterization, and to ensure that Plaintiff received the medical treatment that he believed Dr. Lafata had found to be medically necessary. Moreover, Defendant Woodward argues that his actions were not the proximate cause of any injury Plaintiff suffered as a result of the catheterization because he did not perform the procedure. *See Robinson v. City of Detroit*, 613 N.W.2d 307, 319 (Mich. 2000) (finding governmental immunity does not apply when the "employee's conduct amounts to gross negligence that is the one most immediate, efficient, and direct cause of the injury or damage"). Defendant Woodward claims that either the doctor's order for the procedure, or the nurse's performance of the procedure, was the proximate cause of any injury Plaintiff may have sustained.

Even if Defendant Woodward's conduct demonstrated a substantial lack of concern, as a matter of law, Defendant Woodward's conduct was not the proximate cause of any injury Plaintiff sustained. The fact that Defendant Woodward did not order the catheterization or insert the catheter

is undisputed. The doctor's order to perform the catheterization, and the nurse's performance of the catheterization were the proximate cause of any injury Plaintiff sustained.

Plaintiff also argues that Defendant Woodward is not entitled to governmental immunity for intentional torts. Plaintiff asserts that assault, battery, false arrest, and false imprisonment are intentional torts. It is true that governmental immunity typically does not extend to intentional torts. *See Sudul v. City of Hamtramck*, 221 Mich.App. 455, 458, 562 N.W.2d 478 (1997). However, the law allows police officers to use some force in the exercise of their duties without liability for assault and battery. *See, e.g.*, *Young v. Barker*, 405 N.W.2d 395 (Mich. Ct. App. 1987); *Delude v. Raasakka*, 215 N.W.2d 685 (1974). Police officers are shielded from liability for conduct that would normally constitute a tort, if the conduct was objectively reasonable under the circumstances. *VanVorous v. Burmeister*, 687 N.W.2d 132 (Mich. Ct. App. 2004). *See also Brewer v. Perrin*, 349 N.W.2d 198 (Mich. Ct. App. 1984).

Whether the actions that Defendant Woodward took to restrain Plaintiff were objectively reasonable depends on whether the catheterization of Plaintiff was a "proper goal," and "whether the means that were used to affect the medical procedure were reasonable." *Williams v. Payne*, 73 F. Supp. 2d 785 (E.D. Mich.1999). In this case, it is undisputed that the catheterization was medically necessary, and ordered for no other reason. Thus, there is no question that the catheterization of Plaintiff was a proper goal. In addition, a trier of fact could not conclude that the means used, physical restraint by Defendant Woodward, were unreasonable. Plaintiff does not allege that the force used was excessive, or that any physical injury directly resulted from the restraint. Moreover, Plaintiff was in police custody and Defendant Woodward had a duty to ensure Plaintiff received necessary medical care, even if he verbally objected and physically resisted the

treatment.

Viewing all of the facts in a light most favorable to Plaintiff, he cannot establish that Defendant Woodward's conduct was objectively unreasonable. Thus, Defendant Woodward is entitled to governmental immunity with respect to Plaintiff's claims for assault and battery, false arrest, false imprisonment, and gross negligence, arising out of the events related to the catheterization.

In contrast, Plaintiff has raised a genuine issue of material fact with respect to whether Defendants Woodward and Carter are entitled to governmental immunity with respect to their conduct related to his arrest. As discussed earlier, there is a genuine issue of material fact with respect to the existence of probable cause, and whether Defendants' conduct could be considered "objectively reasonable." Thus, even if Defendants' conduct surrounding Plaintiff's arrest was not grossly negligent, Defendants have not established that they are entitled to governmental immunity.

B

Defendants Woodward and Carter argue that they are entitled to summary judgment based on the merits of Plaintiff's state law claims. Because the Court has found that Defendant Woodward is entitled to governmental immunity with respect to Plaintiff's state law claims arising out of the catheterization procedure, the Court will not address the merits of those claims. With respect to Plaintiff's state law claims arising out of the circumstances surrounding Plaintiff's arrest, Defendants Woodward and Carter do not state with any particularity why the claims fail on the merits, except as to the civil conspiracy claim.

Defendants only substantive argument as to the rest of the claims appears to be that the claims are precluded because Defendants had the necessary probable cause or reasonable suspicion

to arrest and detain Plaintiff.  As discussed earlier, Plaintiff has raised a genuine issue of material fact with respect to probable cause.  Thus, even if a finding of probable cause could preclude Plaintiff's state law claims, summary judgment could not be granted on this ground.

The Court recognizes that the "party bringing the summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts." *Mt. Lebanon Personal Care*, 276 F.3d at 848.  Thus,  the Court finds that summary judgment based on the merits of Plaintiff's state law claims arising out of Plaintiff's arrest is inappropriate, except as to the civil conspiracy claim.

Under Michigan law, a conspiracy requires "an agreement, or preconceived plan, to do an unlawful act." *Bahr v. Miller Bros. Creamery*, 112 N.W.2d 463 (1961).  Defendants Woodward and Carter argue that neither an agreement nor a preconceived plan existed, and that there was no unlawful act committed.  While Plaintiff alleges that Defendants Woodward and Carter acted in concert with Chief Deputy Wissner, Dr. Lafata, and Nurse Schaefer, Plaintiff does not advance any evidence of an agreement or preconceived plan to restrain Plaintiff in order to perform a catheterization without his consent.  Thus, the Court will grant summary judgment as to Plaintiff's civil conspiracy claims.

V

Accordingly, it is **ORDERED** that Defendants Woodward and Carter's motion for summary judgment [Dkt. # 33] is **GRANTED IN PART** and **DENIED IN PART**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: October 9, 2008

-23-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 9, 2008.

s/Tracy A. Jacobs
TRACY A. JACOBS